IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21–cv–03077–CNS–MDB

MARY A. GARCIA,

    Plaintiff,

v.

SUMMIT TECHNICAL SOLUTIONS, LLC,
BRIAN SUTTON, and
TAMIE SHARP,

    Defendants.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Maritza Dominguez Braswell**

This matter is before the Court on "Defendants' Motion to Dismiss Plaintiff's Complaint," filed pursuant to Fed. R. Civ. P. 12(b)(6). (["Motion"], Doc. No. 14.) Plaintiffs have responded in opposition to the Motion, and Defendants have replied. (["Response"], Doc. No. 31; ["Reply"], Doc. No. 33.) For the following reasons, it is **RECOMMENDED** that the Motion be **DENIED**.

## STATEMENT OF THE CASE

Plaintiff Mary A. Garcia ["Plaintiff"] brings this lawsuit against her former employer, Summit Technical Solutions, LLC ["Summit"], and two individuals working for Summit, Brian Sutton and Tamie Sharp [together with Summit, "Defendants"], alleging race discrimination and

retaliation, in violation of 42 U.S.C. § 1981, as well as intentional infliction of emotional distress. (["Complaint"], Doc. No. 1.)

According to the Complaint, Plaintiff was hired by Summit on August 19, 2019. (*Id.* at ¶¶ 12-15.) She alleges that she is Hispanic and that she began experiencing racial discrimination when Mr. Sutton arrived on September 9, 2019 and became her new supervisor. (*Id.* at ¶¶ 4, 15-29.) Specifically, in her first encounter with Mr. Sutton, Mr. Sutton allegedly asked Plaintiff about her race and told Plaintiff that someone "like her" could not do the work. (*Id.* at ¶ 15.) Plaintiff also alleges that, beginning on or around September 16, 2019, Mr. Sutton repeatedly requested that Plaintiff report to his office on an almost daily basis, and "ranted at her that 'people like her' cannot possibly know how to do the job." (*Id.* at ¶ 30.) She alleges that she was "[s]ubjected to escalating racial harassment," and that Mr. Sutton denied her equal opportunity in training. (*Id.* at ¶¶ 31, 34.) Mr. Sutton also allegedly told Plaintiff that he was training "a new white manager;" that he was a master at "making it look like he is giving an employee what he's supposed to before terminating them," and that he "would create a CPI program to make it look like he fully trained Plaintiff." (*Id.* at ¶ 49.)

Plaintiff allegedly reported the "racial discrimination" to Summit's Human Resources Manager, Tamie Sharp, but Ms. Sharp told Plaintiff to "deal with it." (*Id.* at ¶¶ 31, 35.) Plaintiff also alleges that Ms. Sharp told her that she was "unimportant," that she and several of the white technicians at Summit were "Klan," and that Plaintiff needed to "apologize" to the white technicians. (*Id.* at ¶¶ 42-46.) Plaintiff also alleges that Ms. Sharp told her to deal with racial discrimination from Mr. Sutton and everyone else, and that if she did not drop her complaints of racial discrimination, Ms. Sharp would use complaints from technicians against Plaintiff. (*Id.* at ¶

2

47.) Plaintiff describes a hostile encounter with Ms. Sharp, where Ms. Sharp allegedly "displayed hatred in her tone, used a loud voice, and had her face within less than an inch of Plaintiff's left eye[.]" (*Id.*)

According to the Complaint, Plaintiff was terminated on October 25, 2019, "because of her race," and subjected to orders from Ms. Sharp that put her in harm's way the day before. (*Id.* at ¶¶ 52-57.) She also alleges that, even though she was subjected to an investigation and cleared by the military within ten days, Ms. Sharp and Mr. Sutton withheld this information from the Department of Defense, and as a result, Plaintiff has been prevented from obtaining employment. (*Id.* at ¶¶ 22-23.)

Based on these allegations, on November 16, 2021, Plaintiff commenced this lawsuit against the three above-named Defendants, asserting the following claims for relief: (1) § 1981 race discrimination against all Defendants; (2) § 1981 retaliation against Summit; and (3) intentional infliction of emotional distress against all Defendants. (*Id.* at ¶¶ 58-72.) As relief, Plaintiff seeks "compensatory damages, punitive damages, and the costs of this suit." (*Id.* at 13.)

Defendants now move to dismiss the Complaint, in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 14.) Defendants argue that Plaintiff's claims of race discrimination and retaliation should be dismissed, because the facts do not plausibly show that racial animus was the "but for cause" of her injuries. (*Id.* at 6-9.) Defendants also argue that Plaintiff "failed to timely bring suit under Title VII and . . . is improperly attempting to assert her time-barred claims under §1981." (*Id.* at 9.) Defendants argue that Plaintiff's intentional infliction of emotional distress claim should also be dismissed, because the allegations in the

3

Complaint, even if true, do not reach the high standard of outrageousness required by law. (*Id.* at 13.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a Rule 12(b)(6) motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," *i.e.,* those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679–81. Second, the court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, the claim survives the motion to dismiss. *Id.* at 679.

That being said, the court need not accept conclusory allegations without supporting factual averments. *S. Disposal, Inc., v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). Still, all that is required is plausibility, not probability. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). Indeed, a well-pleaded Complaint can survive a motion to dismiss even if "recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555 (citation omitted).

In evaluating a Rule 12(b)(6) motion to dismiss, the court typically may not look beyond the pleadings. *Casanova v. Ulibarri*, 595 F.3d 1120, 1125 (10th Cir. 2010). "Pleadings," for purposes of a Rule 12(b)(6) motion to dismiss, however, include attachments to the complaint, documents incorporated into the complaint by reference, and information subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). Documents attached to a motion to dismiss are considered part of the pleadings, if they are referred to in the complaint and are central to the plaintiff's claims. *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

Here, Defendants have attached to their Motion a charge of discrimination, which Plaintiff apparently filed with the North Dakota Department of Labor and Human Rights ("DOLHR") and the Equal Employment Opportunity Commission ["EEOC"], under those agencies' work-sharing agreement. (Doc. No. 14 at 4-5 n.1; *see* Doc. No. 14-1.) Defendants urge the Court to consider the filing in its evaluation of the present Motion, because Plaintiff references a "Charge of Discrimination" in her Complaint, and because the charge documents are central to Plaintiff's claims. (Doc. No. 14 at 4-5 n.1; *see* Doc. No. 1 at ¶ 50.) Plaintiff, on the other hand, argues that the documents submitted by Defendants should be "disregarded." (Doc. No. 31 at 5.) Plaintiff contends that the Complaint does not reference an "EEOC Charge," but instead only references a charge made in accordance with Defendant's policy. (*Id.*; *see* Doc. No. 1 at ¶ 50.) Plaintiff likewise contends that the charge of discrimination filed with the DOLHR and the EEOC is not "central" to her § 1981 claims. (Doc. No. 31 at 5.)

The Court agrees with Plaintiff. The Complaint alleges that, "[o]n October 24, 2018, Plaintiff submitted a Charge of Discrimination to Tamie Sharp, Defendant's H.R. manager, in accordance with Defendant's policy." (Doc. No. 1 at ¶ 50.) If, in addition to that submission, Plaintiff also submitted a charge of discrimination to the DOLHR and/or the EEOC, those filings are not central to Plaintiff's claims here, given that §1981 does not require the pre-suit exhaustion of administrative remedies. *See Trujillo v. State of Colo.*, 649 F.2d 823, 826 (10th Cir. 1981). Moreover, Defendants admit that the reason they "ask the Court to take judicial notice of these documents" is "because they reveal Plaintiff's motive in asserting her claim[s] under § 1981[.]" (Doc. No. 33 at 4.) Plaintiff's motive for asserting her claims under one law over another is irrelevant to the Court's determination of whether the facts, as alleged in the

6

Complaint, are plausible and give rise to a viable claim. For that reason, the Court declines to consider the charge documents submitted by Defendants in its evaluation of the present Motion.

## ANALYSIS

### I. The § 1981 Claims

"Section 1981 prohibits racial discrimination in 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir. 1995) (quoting 42 U.S.C. § 1981). The statute also protects individuals who have made complaints of such racial discrimination. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008) (holding that "§ 1981 encompasses retaliation claims").

To establish a § 1981 discrimination claim, Plaintiff must show: (1) that she is a member of a protected class; (2) that Defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101-02 (10th Cir. 2001) (quotation marks and citations omitted). To establish a § 1981 retaliation claim, Plaintiff must show: (1) engagement in activity protected under § 1981; (2) a "materially adverse" employment action; and (3) a causal connection between the protected activity and the materially adverse employment action. *Thomas*, 803 F.3d at 514 (citing *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011)).

At issue here is whether Plaintiff has satisfied the causation standard. (*See* Doc. No. 14 at 6.) In *Comcast Corp. v. National Ass'n of African American-Owned Media*, 140 S. Ct. 1009 (2020), the United States Supreme Court considered the viability of a § 1981 claim and held that

7

"a plaintiff must initially plead and prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Id.* at 1019. In other words, a § 1981 plaintiff must show that race was not just one factor, but indeed the reason for, her injuries. *Id.* at 1013-14. If the complaint alleges other non-discriminatory reasons for a plaintiff's termination, the defendants' conduct is not actionable, and the plaintiff's § 1981 claims must be dismissed. *See, e.g.*, *Adetoro v. King Abdullah Acad.*, --- F. Supp. 3d ----, 2020 WL 7122858, at *5 (D.D.C. 2020) (dismissing §1981 claims, where the complaint alleged other, non-discriminatory explanations for the plaintiffs' terminations).

Here, Defendants argue that Plaintiff's allegations of racial discrimination and retaliation fail to satisfy the "but for" causation standard required for § 1981 claims.[1] (Doc. No. 14 at 6-10.) They concede that the allegations "may support an inference" that Plaintiff's race "played some part" in her termination, but they argue that the allegations "are not sufficient to support that race was the 'but for cause' for her termination." (*Id.* at 7.) Specifically, Defendants argue that

---

[1] Defendants contend that "[t]here is no burden shifting in a § 1981 case." (Doc. No. 33 at 4.) This is presumably a reference to the *McDonnell Douglas* burden-shifting framework. "When a plaintiff presents only circumstantial evidence, the *McDonnell Douglas* burden-shifting framework typically applies." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015). "Under this framework, the plaintiff bears the initial burden of establishing a prima facie case . . . [and] the burden then shifts to the employer to articulate a legitimate non-retaliatory reason for taking the adverse employment action before ultimately shifting back to the plaintiff to establish that the employer's explanation is pretextual[.]" *Id.* (internal citations omitted). Defendants' position—that burden-shifting does not apply in § 1981 cases—seems inconsistent with *Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585 (10th Cir. 2020), which held that *Comcast* "did not displace *McDonnell Douglas*'s application to § 1981 claims." *Id.* at 594 n.15. However, the Court does not need to reach a decision on that issue at this time, given that the *McDonnell Douglas* burden-shifting framework is an evidentiary standard, not a pleading standard. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). While the framework may guide a review of the pleadings, it applies at the proof stage. *See, e.g.*, *Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 933-34 (10th Cir. 2015).

Plaintiff "struggled to demonstrate the appropriate level of attention to detail and awareness required to protect sensitive and classified information with the established STS and USAF security protocols," and that "Plaintiff's employment with STS was terminated on October 25, 2019 due to her well-documented security protocol violations and job abandonment." (*Id.* at 3-4.)

In support of their contention that Plaintiff's Complaint points to "other reasons for the termination of her employment that had nothing to do with her race," Defendants rely primarily on three paragraphs in the Complaint:

> On September 9, 2019[,] a Brian Sutton, part owner of Summit, arrived to act as "Temporary Acting Program Manager." He called Plaintiff to a conference room and questioned Plaintiff's qualifications, her ability to do her work, and asked what her race was. He then told Plaintiff that someone "like her" cannot do "this type of important work" and that he did not trust her in meetings with the Airforce.
>
> * * *
>
> Sutton informed Plaintiff he had started a "three agency investigation" against her for being an "insider threat." Sutton told Plaintiff that she would no longer attend the military meetings or enter the third floor [sic] work area, and assigned himself as her replacement.
>
> * * *
>
> Plaintiff notified Tamie Sharp and Brian Sutton on October 24 and October 25, 2019 that she was having chest pains and high blood pressure problems and had gone to the VA medical center and would be out. On October 25, 2019[,] Tamie Sharp emailed Plaintiff a termination letter based on "Job Abandonment" and "repeated security violations." Plaintiff did not have any security violation nor did she abandon her job.

(Doc. No. 14 at 7-8 (citing Doc. No. 1 at ¶¶ 15, 22, 53).) However, none of those paragraphs allege non-discriminatory reasons for Plaintiff's termination. Instead, they describe a sequence of events, allege what Mr. Sutton and Ms. Sharp said to Plaintiff, and in the last paragraph, reject the contention that Plaintiff violated security protocols or abandoned her job.

9

Defendants essentially ask the Court to draw inferences in Defendants' favor and read into the Complaint several non-discriminatory reasons for Plaintiff's termination. But drawing inferences in Defendants' favor would turn the legal standard for a motion to dismiss on its head.[2]

Viewing the alleged facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has stated plausible claims of racial discrimination and retaliation under §1981. The Complaint alleges that Plaintiff was terminated because of her race, that all three Defendants discriminated against her, and that Summit retaliated against her for complaining about the discrimination. (Doc. No. 1 at ¶¶ 54-55.) Specifically, the Complaint alleges that, in Plaintiff's first encounter with Mr. Sutton, Mr. Sutton asked Plaintiff about her race and then proceeded to tell her that someone like her could not do the work. (*Id.* at ¶ 15.) The Complaint also alleges that Plaintiff was treated differently from her white counterparts and colleagues. (*Id.* at ¶¶ 18-20, 26-29, 34.) It also alleges that there was "escalating racial harassment," and that Plaintiff contacted Human Resources to report Mr. Sutton's racial discrimination. (*Id.* at ¶ 31.) It also alleges that Ms. Sharp told Plaintiff that Ms. Sharp and others were "Klan" and that Plaintiff needed to apologize to her white subordinates. (*Id.* at ¶¶ 35, 43-46.) It also alleges that Mr. Sutton withheld information in an effort to negatively impact Plaintiff and told Plaintiff that he would make it

---

[2] As support for their contention that Plaintiff has alleged "other nondiscriminatory reasons" for her termination, Defendants cite *Adetoro v. King Abdullah Academy*, --- F. Supp. 3d ----, 2020 WL 7122858 (D.D.C. 2020). (Doc. No. 14 at 7.) However, in *Adetoro,* the plaintiffs expressly alleged that there were reasons—other than their race—for their termination. Specifically, the plaintiffs alleged that they were discriminated against based on their national origin. *Adetoro*, 2020 WL 7122858, at *4-5. In that case, the court did not have to draw inferences in the defendants' favor because the plaintiffs' allegations plainly provided alternate reasons for the termination. *Id.* That is not the case here.

look like she was fully trained even though she was not, presumably to support a subsequent termination. (*Id.* at ¶¶ 48-49.) Plaintiff alleges that Ms. Sharp sided with, and sought to protect, Mr. Sutton and certain white technicians against claims of discrimination by intimidating Plaintiff and telling her to drop her race discrimination claims. (*Id.* at ¶¶ 39-47.) The Complaint also alleges that the discrimination Plaintiff faced was "because she was Hispanic," and that she was terminated "because of her race," and because she reported the racial discrimination. (*Id.* at ¶¶ 54-55, 61, 67.) The allegations are sufficient to state plausible claims of racial discrimination and retaliation under §1981.

## II. The IIED Claim

Plaintiff also asserts a supplemental state law claim against Defendants for intentional infliction of emotional distress ["IIED"]. (Doc. No. 1 at ¶¶ 70-72.) As an initial matter, while the parties' briefing cites to both Colorado and North Dakota law, neither side has directly addressed which state's substantive law governs Plaintiff's IIED claim. In diversity cases, the substantive law of the forum state—including the forum state's choice of law rules—governs the analysis of the underlying claims. *Haberman v. Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006). "This rule also applies when a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1201 (10th Cir. 2022) (quoting *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999)) (alteration omitted). However, "[u]nlike jurisdictional issues, choice of law need not be raised sua sponte." *W. Heritage Bank v. Fed. Ins. Co.*, 557 F. App'x 807, 812 (10th Cir. 2014) (citing *Flying J Inc. v. Comdata Network Inc.*, 405 F.3d 821, 831 n.4 (10th Cir. 2005)). Accordingly, the Court assumes without deciding that Colorado law applies to Plaintiff's IIED

claim, and therefore, the Court looks to Colorado substantive law to determine whether Plaintiff has plausibly alleged a claim for relief. *See Alattar v. Bell*, No. 13-cv-02990-MSK-KMT, 2014 WL 4851655, at *5 (D. Colo. Sept. 29, 2014) (applying the forum state's substantive law, where the parties did not contest its applicability to the underlying state law claims).

Under Colorado law,[3] the required elements of an IIED claim are: "(1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendant's conduct caused the plaintiff to suffer severe emotional distress." *English v. Griffith*, 99 P.3d 90, 93 (Colo. App. 2004) (citing *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994)); *see also Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665 (Colo. 1999) (describing this tort as "intentional infliction of emotional distress by outrageous conduct"). "The level of outrageousness required for conduct to create liability for intentional infliction of emotional distress is extremely high." *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1126 (Colo. App. 2000) (citing *Coors Brewing*, 978 P.2d at 666). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Coors Brewing*, 978 P.2d at 666 (quoting Restatement (Second) of Torts § 46 (1965)); *see Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his

---

[3]Under North Dakota law, which the parties also reference, the required elements of an IIED claim are essentially identical: "(1) extreme and outrageous conduct that is (2) intentional or reckless and that causes (3) severe emotional distress." *G.K.T. v. T.L.T.*, 798 N.W.2d 872, 874 (N. Dak. 2011) (quoting *Muchow v. Lindblad*, 435 N.W.2d 918, 923-24 (N. Dak. 1989)).

resentment against the actor, and lead him to exclaim, 'Outrageous!'"). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient." *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003); *see also Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir. 1988) ("[T]he defendant's conduct must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.").

The facts necessary to prove an IIED claim cannot be "identical to" the facts necessary to prove "the federal statutory claims over which the court has original jurisdiction." *Emerson v. Wembley USA, Inc.*, 433 F. Supp. 2d 1200, 1228 (D. Colo. 2006) (quoting *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994)) (alterations omitted). In other words, the "allegations forming the basis of a claim for outrageous conduct *must exceed* those which would state a colorable claim of discrimination." *Id.* (citing *Visor v. Sprint/United Mgmt. Co.*, 965 F. Supp. 31, 33 (D. Colo. 1997)) (emphasis in original); *see Grandchamp*, 854 F.2d at 384 ("It is well-settled under Colorado law that discharge from employment, without more, is not outrageous conduct.") (collecting cases); *see also Gard*, 859 F. Supp. at 1354 (stating that an IIED claim is not meant to be an "incantation to augment damages"). Thus, "[w]here the allegations forming the basis of a claim for outrageous conduct are the same as those forming the basis for a claim of discrimination, and nothing more, they fail to state an independently cognizable claim for which relief can be granted under Rule 12(b)(6)." *Visor*, 965 F. Supp. at 33; *see, e.g., Salimi v. Farmers Ins. Grp.*, 684 P.2d 264, 265 (Colo. App. 1984) (affirming the dismissal of an IIED claim, which was "largely based upon" allegations that the plaintiff was demoted in violation of the employer's policy and procedure manual).

That being said, "it is equally clear that an employer is not shielded from employee claims of outrageous conduct." *Grandchamp*, 854 F.2d at 385. Rather, in cases where both employment-based discrimination claims and IIED claims are alleged, "the *manner* of the discharge, and the employer's conduct, is critical to a finding of outrageous conduct." *Id.* (citing *Montgomery Ward & Co. v. Andrews*, 736 P.2d 40, 46 (Colo. App. 1987)) (emphasis in original). For instance, a viable IIED claim may be found where the employer acted with knowledge of the employee's vulnerable state. *See, e.g., Christen-Loper v. Bret's Electric, LLC*, 175 F. Supp. 3d 1213, 1226 (D. Colo. 2016) (finding a plausibly alleged IIED claim, in addition to a Title VII claim, where the complaint's allegations reasonably suggested that, while the plaintiff "was lying in a hospital bed after suffering a severe bi-polar episode and under a suicide watch, her employer, who was aware of the plaintiff's "compromised circumstances, took the opportunity to terminate [the] plaintiff's employment because it was upset with her for taking time off from work to visit her doctor"); *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499-500 (Colo. App. 2002) (holding evidence sufficient to support an IIED claim, where an employer discharged the plaintiff while he was on sick leave recuperating from a heart condition, and did so by entering the plaintiff's home uninvited and giving him the termination notice as he lay in bed).

Here, Plaintiff alleges facts that, if proven true, reflect the type of humiliating and harassing behavior that is actionable in tort. These allegations are separate and in addition to the facts that support her federal statutory claims.

First, and with respect to Mr. Sutton, Plaintiff alleges that Mr. Sutton sought to manipulate certain trainings and withheld information to make Plaintiff appear incompetent. (*Id.* at ¶¶ 23, 32, 38, 48-49.) Plaintiff also alleges that Mr. Sutton, "on an almost daily basis," would

14

"rant" at her, tell her she was not smart enough for the work, and that he "yelled at Plaintiff…while banging his fist on the table." (*Id.* at ¶¶ 30, 33.) Mr. Sutton also allegedly "repeatedly told Plaintiff's staff not to listen to her," and would "call Plaintiff to his office trying to provoke Plaintiff[.]" (*Id.* at ¶¶ 29, 37.)

Second, and with respect to Ms. Sharp, Plaintiff alleges that on multiple occasions she reported the alleged racial discrimination to Ms. Sharp, who repeatedly told Plaintiff to simply "deal with it" or "drop it." (*Id.* at ¶¶ 31, 35, 43-44, 47.) Plaintiff also alleges that Ms. Sharp told Plaintiff that she and others were "Klan," and that Plaintiff needed to apologize to all the white technicians. (Doc. No. 1 at ¶¶ 44-46.) In light of other allegations in the Complaint, the reference to "Klan" is presumably a reference to the Ku Klux Klan. At a minimum, the alleged comments are racist and menacing. But given the historical context and reputation of violence and hate associated with the Ku Klux Klan, and in particular, the violence and hate towards minority groups, a reference to the Ku Klux Klan by an HR manager, in response to an employee's claim of racial discrimination, could be perceived as overtly threatening, intolerable, and outrageous. *See Atsepoyi v. Tandy Corp.*, 51 F. Supp. 2d 1120, 1125 (D. Colo. 1999) (finding a viable IIED claim, where the complaint alleged ongoing racial harassment at the plaintiff's workplace, including a coworker's use of racial slurs to describe nonwhite individuals, reflecting a culture of "denigrating" and "intolerable" behavior that was condoned by the employer); *Jarmon v. Pacific Rail Servs., LLC*, No. 06-cv-01372-REB-PAC, 2007 WL 678644, at *1-2, 4 (D. Colo. Mar. 1, 2007) (finding a viable IIED claim, where the plaintiff alleged a "pattern of racial intimidation and incidents of physical violence"); *see also Matthys v. Narconon Fresh Start*, 104 F. Supp. 3d 1191, 1205-06 (D. Colo. 2015) (finding a viable IIED claim, where the defendant allegedly made

false representations to the plaintiff that it was a secular drug treatment facility, and where the plaintiff was alleged to be suffering from addiction, and thus, "particularly susceptible to emotional distress"). Plaintiff also alleges that Ms. Sharp "ordered Plaintiff to put herself in harm's way[,]" when she asked her to make a U-turn and return to work. (Doc. No. 1 at ¶ 52.) The Court does not consider whether this or any other allegation in the Complaint is true or not true. Instead, it presumes the facts are as pleaded, and if indeed Ms. Sharp ordered Plaintiff to put herself in harm's way, then that too could give rise to a claim for IIED.

In short, Plaintiff has alleged that Mr. Sutton and Ms. Sharp were intentional in their efforts to discredit, harass, isolate, and even threaten Plaintiff. Plaintiff's allegations plausibly suggest that Mr. Sutton and Ms. Sharp did so in furtherance of Summit's business. *See Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 472 (Colo. 1995) (stating that an employer can be held liable for an employee's intentional tortious acts committed in furtherance of the employer's business). The Court cannot make credibility determinations at this stage, and all inferences must be drawn in Plaintiff's favor. Because Plaintiff has alleged extreme, intolerable, and outrageous conduct by Mr. Sutton and Ms. Sharp, and by extension Summit, and because those allegations are in addition to other allegations that form the basis of Plaintiff's § 1981 claims, the Court finds that Plaintiff has sufficiently pleaded a viable claim for IIED against Defendants.

## RECOMMENDATION

**WHEREFORE**, for the foregoing reasons, this court respectfully

**RECOMMENDS** that "Defendants' Motion to Dismiss Complaint (ECF No. 1) Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. No. 14) be **DENIED**.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had

waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 26th day of September, 2022.

BY THE COURT:

Maritza Dominguez Braswell
United States Magistrate Judge